**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**PARK-OHIO INDUSTRIES, INC.,**
**an Ohio Corporation and AJAX**
**TOCCO MAGNETHERMIC**
**CORPORATION, an Ohio Corporation,**

               **Plaintiff(s),**            **CASE NUMBER: 06-15652**
                                        **HONORABLE VICTORIA A. ROBERTS**

**v.**

**MICHAEL J. CARTER,**

               **Defendant(s).**
_____/

**ORDER**

**I.     INTRODUCTION**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, Temporary Restraining Order and Request for Expedited Scheduling and Hearing.  Also, although not formally filed as a separate motion, Defendant asks the Court to dismiss (or grant summary judgment on) Plaintiffs' claims.[1]

On January 9, 2007, the Court held a telephone conference with counsel for each party during which the Court denied Plaintiffs' request for a temporary restraining order.  Therefore, the only issues before the Court are Plaintiffs' request for a preliminary injunction and Defendant's request for dismissal or summary judgment.

_____

[1]Defendant vacillates between asking for dismissal (presumably pursuant to FRCP 12(b)(6)) or summary judgment (pursuant to FRCP 56(c)).  *See* Def. br. at pp. 1, 3, 8, 12.

1

A hearing was scheduled for February 9, 2007.  But, inasmuch as the parties indicate they do not intend to present evidence, the hearing is **CANCELLED**, and the Court decides this matter based on the brief submitted by the parties and applicable law.

## II.    BACKGROUND

Plaintiff Park-Ohio Industries, Inc. ("Park-Ohio") and its subsidiary, Ajax Tocco Magnethermic Corporation ("Ajax"), bring this action against their former employee, Defendant Michael J. Carter.  Carter resides in Michigan.  Plaintiffs are incorporated in Ohio.

Carter was hired by Park-Ohio in 1978 in an entry level position.  He worked for Ajax (and its predecessors), until he resigned on December 5, 2006.[2]  When Carter resigned, he was the Director of Midwest Operations.  He left Ajax to take the same position with one of Ajax's direct competitors, Tech Induction Corporations ("Tech Induction").

Ajax designs, manufactures, services and repairs induction heating and melting equipment for a variety of industries.  As the Director of Ajax's Midwest Operations, Carter's primary responsibility was to manage and operate Ajax's induction heat treating repair business for the automotive industry in Michigan, Indiana, Ohio and Ontario, Canada.

Plaintiffs say Carter was privy to Ajax's confidential information and trade

_____

[2]Carter actually gave three weeks notice on December 1, 2006.  However, the President of Ajax, Thomas Illencik, asked Carter to leave on December 5th after Carter refused to reconsider his decision and remain with Ajax.

2

secrets, including: 1) costs and margins for Ajax products and services; 2) proprietary designs for crankshaft inductors manufactured by Ajax; 3) strategic plans for increasing Ajax's business in the heat treating area and in better competing with competitors such as Tech Induction; 4) key contacts for Ajax customers; 5) tailored solutions developed by Ajax to address the concerns and issues of specific customers; and 6) the repair problems, repair cycles, and cost and timing concerns of Ajax customers. *See* Pls. br., Exh. A, Affidavit of Thomas Illencik at ¶¶ 9,14,16.

Additionally, Plaintiffs assert that Carter has knowledge of trade secrets relative to the crankshaft inductors Ajax manufactures. Ajax says that it has a proprietary design for crankshaft inductors which gives it a significant advantage over its competitors. In fact, Ajax says it takes extraordinary measures to protect its designs, including the installation of side shields into the product to prohibit customers and competitors from reverse engineering the product. Carter knows how the shields are installed and how to remove them without destroying the inductors.

Plaintiffs also claim that one of Carter's key duties was to develop and maintain close relationships with Ajax customers. They say he was the key contact person for all induction heat treating customers; he was required to participate in sales calls and directly interact with customers in handling and servicing accounts. Indeed, Plaintiffs say Carter was the "face" of Ajax with respect to the heat treating repair business for the automotive industry.

Tech Induction is a direct competitor of Ajax in the manufacturing, service and repair of heat treating equipment for the automotive industry. One significant area in which Tech Induction and Ajax compete is the sale and service of heat treating

3

equipment for automobile crankshafts.  Tech Induction operates a facility in Clinton Township, Michigan, which is just 20 miles from Ajax's primary facility for induction heating in Madison Heights, Michigan.

Carter disputes many of Plaintiffs' assertions.  He denies that he was the "face" of Ajax when he resigned.  He says that: 1) he did not directly supervise the sales staff and his interaction with customers was limited to complaints, repairs and infrequent sales calls where he would act as technical support; 2) he does not possess knowledge of any of Ajax's customers' current repair problems, repair cycles, cost concerns or timing concerns; and 3)  Plaintiffs knew before he resigned that Tech Induction already services Ajax's key customers and have been providing services to those customers for several years.

Carter also asserts that Tech Induction began repairing Ajax's crankshaft inductors almost one year before he resigned and that it has already reverse engineered[3] Ajax's crankshaft inductors.  Carter said that he made Ajax aware of Tech Induction's reverse engineering more than six months before he resigned.  Therefore, Carter asserts that Plaintiffs' fear that he will disclose confidential information or trade secrets relative to the crankshaft inductors is unfounded.

Plaintiffs assert that Carter is being disingenuous about his role in the company. Carter says his interaction with customers was "limited" to complaints, repairs and

---

[3]The parties do not define the term "reverse engineering."  But, it is defined as follows in the *Merriam -Webster's Online Dictionary* <http://www.merriamwebster.com> (February 8, 2007):  to disassemble and examine or analyze in detail (as a product or device) to discover the concepts involved in manufacture usually in order to produce something similar.

4

infrequent sales calls.  But, Ajax President Illencik says "'[r]epairs is the primary

business in which Ajax Tocco is engaged and interacting with customers with respect to

repairs is a key function of the manager of that business and the most important

customer interaction there is."  Pls. Reply, Exh. 1, Affidavit of Thomas Illencik at ¶3.

Illencik also says that Carter's claim that he has no knowledge of current customer

repair problems, repair cycles, and cost and timing concerns is untrue.  Actually, Illencik

says Carter maintained a computer database with this information, accessed the

database daily and updated it regularly, and signed every quote sent to customers

(which implies his knowledge about repair cycles, cost concerns and problems).  *Id* at

¶4.  Finally, contrary to Carter's asserted certainty that Tech Induction has already

reverse engineered Ajax's crankshaft inductor, Illencik believes that neither Tech

Induction nor any other company has successfully done so.

Plaintiffs allege that Carter's acceptance of the position with Tech Induction

violates the Employee Non-Competition Agreement ("the Agreement") he signed in

1978.  In the Agreement, Carter agreed not to work for a competitor anywhere in the

United States or Canada where Plaintiffs are selling products or service, for a period of

one year after his employment with Plaintiffs ends:

> (2)     During my employment by the [Plaintiffs] and for a period of
> one year thereafter I will not directly or indirectly engage in,
> have any material interest in, or advise, assist or render
> services to, any "Competitive Business."  "Competitive
> Business" shall mean any person, firm or corporation which is
> selling or attempting to sell any products or services
> competitive with any products or services then being offered
> by the division or subsidiary of the [Plaintiffs] by which I am or
> was employed in any part of the United States or Canada in
> which the [Plaintiffs are] then selling or attempting to sell such
> products or services.

5

(3)     The validity and interpretation of this agreement shall be
        determined under the laws of the State of Ohio.

Pl. Exh. B, ¶2.  Plaintiffs further allege that Carter is in a position to interfere with their

customer relationships and to disclose or use their confidential information and trade

secrets to assist Tech Induction.  Therefore, Plaintiffs filed a two-count complaint

alleging breach of contract and violation of the Uniform Trade Secrets Act ("UTSA").

They ask the Court to enter a preliminary injunction to preclude Carter from:

1.     Directly or indirectly engaging in, having any material interest
       in, or advising, assisting or rendering services to any person,
       firm or corporation which is engaged in the induction heat
       treating repair business for the automotive industry in
       Michigan, Indiana, Ohio and Windsor, Ontario, including but
       not limited to Tech Induction Corporation;

2.     Disclosing to any third persons, any information related to
       Plaintiffs' design of heat treating equipment for automobile
       crankshafts and any information related to Plaintiffs' costs and
       margins for products and services, marketing strategies,
       and/or customer contact information and customer information
       regarding design specifications testing specifications, testing
       results and procedures developed for Plaintiffs' customers in
       the induction heat treating repair business for the automotive
       industry.

Pls. br. at p. 20.  However, if Defendant does not secure other employment, Plaintiffs

indicate they will continue to pay Defendant's salary and health care benefits during the

period he is enjoined.

Carter contends that the non-compete agreement is unenforceable as a matter of

law, and that he does not possess any confidential customer or trade secret information

which has not already been discovered by Tech Induction.   Therefore, he asks the

Court to not only deny Plaintiffs' motion, but to also dismiss (or grant summary judgment

6

on) Plaintiffs' claims in their entirety.

## III.   APPLICABLE LAW AND ANALYSIS

When deciding a motion for preliminary injunction, the Court must consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), *cert den.*, 526 U.S. 1087 (1999). No single factor is dispositive. The Court must balance each factor to determine whether they weigh in favor of an injunction. *Id.* For the reasons stated below, the Court should find that the factors weigh in Plaintiffs' favor.

### A.   Breach of Contract

#### i.   Likelihood of Success on the Merits

##### a.   Choice-of-law

The relevant facts are not in dispute--Defendant resigned and immediately took a position with one of Plaintiff's direct competitor's in Michigan, contrary to the express prohibitions in the non-compete agreement Defendant signed in 1978. Plaintiff's likelihood of succeeding on its breach of contract claim to enforce that agreement depends in the first instance on which state's law applies--Michigan or Ohio.

The choice-of-law provision in the Agreement states that it must be construed under Ohio law. Non-compete agreements are enforceable in Ohio. *See Raimonde v Van Vlerah*, 42 Ohio St. 2d 21, 25-26 (1975); *Lake Land Employment Group of Akron, L.L.C. v Columber*, 101 Ohio St. 3d 242, 245 (2004). Defendant, however, asserts that

the Court is precluded under Michigan's choice-of-law rules from applying Ohio law on this issue because, in 1978, non-compete agreements were unenforceable in Michigan. Therefore, Defendant contends that enforcing the agreement would violate a fundamental Michigan public policy.

In a diversity case, a district court "is obligated to apply the choice of law rules of the state in which it sits." *Security Ins Co v Kevin Tucker & Assoc*, 64 F.3d 1001, 1005 (6th Cir. 1995); *Mahne v Ford Motor Co.,* 900 F.2d 83, 86 (6th Cir. 1990), *cert den.*, 498 U.S. 941 (1990).  Therefore, the Court must look to Michigan choice-of-law rules.

Michigan adopted §§187 and 188 of the Restatement (Second) of Conflict of Laws.  *Chrysler Corp. v Skyline Industrial Services, Inc.*, 448 Mich. 113, 124-125 (1995).  Section 187(2) provides, in relevant part, that parties will be bound by a contractual choice-of-law provision unless:

> a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under §188,[4] would be the state of the applicable law in the

---

[4]§188 states:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws §187(2) (footnote added).  See also *Kipin*

*Industries, Inc. v Van Deilen International, Inc.,* 182 F.3d 490, 493 (6th Cir. 1999).

Defendant asserts his arguments under §187(2)(b).  Therefore, he must establish

that 1) applying Ohio law would violate a fundamental policy of Michigan; 2) Michigan

has a materially greater interest than Ohio in the determination of this issue; and 3)

Michigan law would have applied in the absence of the choice-of-law provision.  The

parties dispute the first two prongs.  The Court finds that Defendant failed to establish

either prong.

### 1.      Fundamental Public Policy

Non-compete agreements were enforceable in Ohio in 1978 and they are

enforceable today.  *See Raimonde*, 42 Ohio St.2d at 25-26; *Lake Land Employment*

*Group of Akron,* 101 Ohio St.3d at 245.  In Michigan, non-compete agreements were

"against public policy and illegal and void" in 1978:

> Section 1. All agreements and contracts by which any person, co-partnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or

---

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203

unlimited, are hereby declared to be against public policy and illegal and void.

M.C.L. §445.761.  However, that statute was repealed on March 29, 1985 by the

Michigan Antitrust Reform Act, M.C.L. §445.774a.  Under §445.774a, reasonable non-

compete agreements entered after March 29, 1985 are enforceable:

> (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

> (2) This section shall apply to covenants and agreements which are entered into after March 29, 1985.

But, because the legislature did not make §445.774a retroactive, non-compete

agreements entered prior to March 29, 1985 are still deemed void under §445.761.  *See*

*Lansing-Lewis Services, Inc. v Schmitt*, 188 Mich. App. 647, 652-653 (1990); *Rehmann,*

*Robson & Co. v McMahn*, 187 Mich. App. 36, 40 n.1.

Defendant does not dispute that non-compete agreements do not offend current

public policy in Michigan.  But, he asserts that the agreement he signed is not

enforceable under current or former Michigan law.  Therefore, citing *Barnes Group, Inc.*

*v C&C Products, Inc.,* 716 F.2d 1023, 1029 (4th Cir. 1983)*, Fine v Property Damage*

*Apraisers, Inc.,* 393 F.Supp. 1304 (E.D. La. 1975) and *Boyer v Piper, Jaffray &*

*Hopwood, Inc.*, 391 F.Supp. 471 (D.S.D. 1975), Defendant argues that applying Ohio

law would revive a contract that is unenforceable in Michigan and necessarily

10

trespasses on Michigan's fundamental policy.

Defendant further argues that Plaintiffs' focus on Michigan's post-1985 policy ignores the fact that §445.761 rendered his non-compete agreement void as though it never existed. And, citing *Fine*, he asserts that the change in the statute and public policy seven years after his Agreement does not revive the void agreement. Therefore, Defendant contends that Plaintiffs cannot establish that there is a valid non-compete agreement on which to base their breach of contract claim.

Plaintiffs essentially argue (most clearly in their Reply) that Defendant improperly focuses on Michigan's law, rather than Michigan's public policy. In support, Plaintiffs cite *Chrysler Corporation v Skyline Industrial Services, Inc., supra*, where the Michigan Supreme Court analyzed Michigan and Illinois law on an indemnification clause in a construction contract. The contract was performed in Illinois, but it was negotiated and executed in Michigan and included a Michigan choice-of-law provision. The indemnification provision was void under Illinois law, but it was valid under Michigan law unless certain circumstances existed. Michigan and Illinois law on indemnification contracts was otherwise similar in scope and purpose. The *Chrysler* Court focused on the similarities in Michigan and Illinois law and found that, although the clause was void under Illinois law, Michigan and Illinois public policy on the issue was comparable. Therefore, the Court found that the Michigan law did not violate a fundamental Illinois public policy.

In its analysis, the *Chrysler* Court cited a Maryland Court of Appeals decision which was similarly decided--*Kramer v Bally's Park Place, Inc.,* 311 Md. 387 (1988). *Kramer* involved a casino's attempt to recover a gambling debt incurred by the

11

defendant.  There was no written agreement, but the debt was incurred in New Jersey and plaintiff filed suit to recover the debt in Maryland.  Although gambling contracts were enforceable in New Jersey, Defendant argued that the Maryland court should decline to enforce the New Jersey contract provision because gambling was not regarded as valid consideration for a contract in Maryland.

Maryland law required the *Kramer* court to apply the law of the jurisdiction where the contract was made ("the *lex loci contractus* principle") unless the out-of-state provision violated a very strong Maryland public policy.  After analyzing Maryland law on the enforcement of gambling debts, the *Kramer* court held that it could not find that Maryland public policy against gambling or gambling debts was strong enough to override the *lex loci contractus* principle, because Maryland enforced gambling debts under certain circumstances.  The *Kramer* court cited with favor the reasoning of another court which stated that public policy is determined by the "prevailing social and moral attitudes of the community," not just by the laws of the forum state.  311 Md. at 397-398 (*citing Intercontinental Hotels Corp. v Golden*, 15 N.Y.2d 9, 14-15 (1964)).

Like *Kramer*, Plaintiffs argue that whether its non-compete agreement is enforceable under Michigan law is not the determining factor.  Rather, Plaintiffs say the question is whether the Michigan law which renders the contract unenforceable is an expression of the "prevailing social and moral attitudes of the community."  Plaintiffs argue that Michigan's prohibition against non-compete agreements over 20 years ago is not reasonably regarded as an expression of the current "prevailing social and moral attitudes" inasmuch as current Michigan policy allows such agreements.

Plaintiffs also dispute Defendant's assertion that the contract was completely

void because it was not enforceable under Michigan law.  Plaintiffs point out that the

contract provides that Ohio law applies and it was valid under Ohio law.  Further,

Plaintiffs assert that Michigan law does not extend outside Michigan.  In support,

Plaintiffs cite *Comshare, Inc. v Execucom Systems Corp.,* 593 F.Supp. 981 (E.D. Mich.

1984), in which the Court rejected the argument Defendant asserts.

In *Comshare*, a Michigan resident (Patricia Palmer) entered into an employment

contract with Execucom, a Texas corporation, in 1979.  The contract included a three-

year non-compete clause and a Texas choice-of-law provision.  In 1984, Palmer

resigned from Execucom and took a job with one of its direct competitors, Comshare.

Palmer and Comshare subsequently filed a complaint requesting an injunction to

prohibit enforcement of the non-compete agreement and a declaration that it violated

Michigan public policy as set forth in M.C.L. §445.761.

Plaintiffs filed a motion for summary judgment arguing that §445.761 prevented

enforcement of the non-compete throughout the United States because Palmer and her

employment relationship with Execucom were in Michigan.  Execucom asserted that the

choice-of-law provision should be honored.  The Court rejected Plaintiffs' argument and

characterized it as remarkable.  The Court noted that the relief Plaintiffs' sought "would

give extraterritorial effect to a Michigan statute, and prevent Execucom from obtaining

the benefit of its contract in states which might have no such prohibition against such a

contract."  593 F.Supp. at 986.  Inasmuch as Plaintiffs cited no authority for such relief,

the Court instead applied the choice-of-law principles set out in the Restatement and

found that Texas law applied.

The Court finds that Plaintiffs are correct with respect to both of Defendant's

13

arguments--1) Michigan's choice-of-law rules require the Court to consider Michigan's current public policy, and 2) Michigan's pre-1985 law voiding non-compete agreements has no force outside of Michigan's borders.

Additionally, at least two courts have rejected Defendant's argument that the question of whether enforcement of a foreign choice-of-law provision violates the forum state's fundamental public policy must be answered based on the policy in effect at the time the contract was executed rather than at the time of enforcement.  In an unpublished opinion, the Sixth Circuit in *Monsanto Company v Manning,* 841 F.2d 1126 (6th Cir. 1988), held that courts must consider current public policy when deciding choice-of-law questions.

In *Monsanto*, the plaintiff appealed the district court's denial of its request to extend a preliminary injunction previously issued to enforce a non-compete agreement executed in 1972 and allegedly breached in 1987 (after §445.761 was repealed).  It was necessary for the *Monsanto* Court to determine which state law--Michigan or Missouri--applied to the non-compete agreement (in its analysis of whether plaintiff established a substantial likelihood of success on its breach of contract claim).  The parties' agreement did not include a choice-of-law provision.  But, under Michigan law, a contract was considered to have been formed in the state where the last act necessary to make it binding took place.  Because the defendant signed the contract in Michigan, he asserted that Michigan law should apply.  But, plaintiff claimed to have signed the contract in Missouri.

If the contract was signed in Michigan, the *Monsanto* Court held that it was clearly unenforceable because it was entered prior to the repeal of M.C.L. §445.761.

14

Defendant asserted that it was unenforceable for the same reason even if Missouri law

(which permitted non-compete agreements) applied.  The *Monsanto* Court rejected the

defendant's argument because Michigan public policy no longer prohibits non-compete

agreements:

> [I]f the contract in this case is a Missouri contract, it was valid when
> signed in 1972.  Michigan law has no impact on the legality of a
> Missouri contract until a party seeks to enforce the covenant not to
> compete in a court in Michigan.  **In this case, enforcement is
> sought at a time when Michigan law does not prohibit such
> covenants as a matter of public policy.**

841 F.2d at *5 (emphasis added).[5]

A Massachusetts district court in *Shipley Company, Inc. v Clark*, 728 F.Supp. 818

(D. Mass. 1990), also considered Michigan's current rather than former public policy

with regard to a non-compete agreement executed prior to 1985.  In *Shipley*, plaintiff

was a Massachusetts corporation which sued two of its former employees.  Defendants

were Michigan residents working in plaintiff's Michigan office.  They signed non-

compete agreements in 1978 in Michigan.  The agreements precluded defendants from

working for competitors or soliciting customers in the geographical region in which they

worked (Michigan and other parts of the Midwest) for one year after leaving plaintiff's

employ.  The agreements also included a choice-of-law provision which required that

they be construed in accordance with Massachusetts law.  Defendants resigned in 1989

and formed a corporation which directly competed with plaintiff.  Through the newly

formed company, defendants acquired the business of one of plaintiff's customers, an

account defendants worked on extensively while working for plaintiff.

---

[5]The Court ultimately found that plaintiff failed to prove that Missouri law applied.

15

Plaintiff requested an injunction to preclude defendants from, *inter alia*, violating their non-compete agreements.  Although the agreements specified that Massachusetts law would apply, defendants argued that to do so would contravene Michigan's strong public policy against non-compete agreements.  Defendants based their argument on the fact that §445.761 prohibited non-compete agreements when they signed them in 1978.  The *Shipley* Court rejected this argument, however, finding that Michigan's repeal of §445.761 in 1985 indicated that Michigan no longer has a strong public policy against non-compete agreements.

The *Shipley* Court also rejected defendant's assertion that Michigan's continued enforcement of §445.761 to void non-compete agreements executed prior to 1985 indicates that Michigan still has a strong policy against enforcement of those agreements.  The Court asserted that defendant's argument failed to take into account the distinction between Michigan's *law* and its *current public policy*, which does not prohibit non-compete agreements:

> [T]he proper inquiry under Massachusetts choice-of-law rules is whether Michigan has a fundamental *public policy* that would be frustrated by the application of Massachusetts' substantive law, and *not* whether a Michigan court would void the covenant pursuant to a statute.  **Michigan has expressed its current view that it is no longer bothered by in-state restraints on competition imposed by reasonable no-compete agreements.  Enforcement of the choice-of-law provision, therefore, would violate Michigan *law* but not Michigan *policy*.  It is only the latter that is relevant here.**

728 F.Supp. at 826 (emphasis added).

*Monsanto* and *Shipley's* holdings are consistent with the holding in *Chrysler*. Each case demonstrates that a state's law and its public policy are not always

16

synonymous, and that they do not have to be for choice-of-law purposes. The Court's analysis must focus on Michigan's public policy, not Michigan's law.

Therefore, the fact that Michigan's current and former laws would prohibit enforcement of the non-compete agreement in this case reflects only on Michigan law, not its public policy. The existing public policy indisputably permits non-compete agreements, and Defendant failed to cite any authority which requires the Court to look beyond the existing public policy.

Defendant's second assertion, that the contract is unenforceable under any other state law because it was voided by §445.761, also lacks merit. Again, Defendant failed to cite any authority which supports his assertion. He only cites *Fine*, in which the Court declined to apply a foreign non-compete law because it conflicted with the existing public policy of the forum state against enforcement of non-compete agreements. There is no basis to extend the *Fine* court's holding as Defendant suggests. Therefore, as in *Comshare*, the Court rejects Defendant's assertion that Michigan's pre-1985 law prohibits enforcement of the contract under a foreign state law.

In sum, the Court finds that applying Ohio law, which permits the enforcement of non-compete agreements, would not contravene a fundamental Michigan public policy.

### 2.    Materially Greater Interest

Plaintiffs are Ohio corporations and they argue that Ohio's interest in protecting Plaintiffs from breach of lawful contracts is at least equal to Michigan's interest in protecting its citizen and enforcing its laws with respect to non-compete agreements. Therefore, Plaintiffs assert that there is no basis for finding that Michigan's interest is "materially" greater than Ohio's.

17

Defendant lives in Michigan.  But, he only asserts that Michigan has a greater interest because the case involves a contract which is unenforceable under Michigan law.  Again, however, Defendant cites no authority which indicates that the mere fact that Michigan and Ohio law conflict makes Michigan's interest "materially greater" than Ohio's.

At most, it appears that Michigan and Ohio have relatively equally interests in the application of their respective laws for the protection of their respective citizens, which is insufficient.  *See Chrysler*, 448 Mich. at 133 ("We decline to void the parties' express preference for Michigan law in the absence of compelling evidence that Illinois has a materially greater interest than Michigan.").  Therefore, the Court finds that Defendant failed to carry his burden on this prong as well.

### b.  Likelihood of Success Under Ohio Law

Ohio state courts enforce reasonable non-compete agreements.  An agreement is reasonable "if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde*, 42 Ohio St.2d at 26.  A court may modify a non-compete agreement which includes unreasonable restrictions and enforce it to the extent necessary to protect an employer's legitimate interests.  *Id* at 25-26.  To determine whether the restrictions imposed are reasonable, a court must consider the presence or absence of a number of factors:

> [W]hether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience,

18

> whether the benefit to the employer is disproportionate to the
> employee's detriment, whether the covenant destroys the
> employee's sole means of support, whether the employee's talent
> was developed during the employment, and whether the forbidden
> employment is merely incidental to the main employment.

*Basicomputer Corp. v Scott*, 973 F.2d 507, 512 (6th Cir. 1992)(citing *Raimonde*, 42 Ohio

St. 2d at 25).

Plaintiffs contend that the restrictions imposed in this case are reasonable and

necessary to protect its customer relationships (*i.e.*, goodwill) and confidential

information. Ohio recognizes such considerations as legitimate interests for an

employer to protect via a non-compete agreement. In fact, in *Proctor & Gamble Co. v*

*Stoneham*, 140 Ohio App. 3d 260, 276 (2000), the Court found that a three-year non-

compete agreement was reasonable where there was clear and convincing evidence

that (among other things): 1) the defendant had access to confidential information and

trade secrets; 2) the agreement only sought to limit unfair competition by prohibiting

defendant's employment in the same industry (hair care) with a direct competitor; and 3)

enforcing the agreement would not stifle the defendant's skills in the market or destroy

his sole means of support, since he could work for the competitor in areas other than

hair care.

Similarly, in *Avery Dennison Corp. v Kitsonas,* 118 F.Supp. 2d 848, 853 (S.D.

Ohio 2000)*,* the court found that a non-compete was reasonable in scope[6] where

(among other things): 1) defendant possessed confidential information about customer

lists, pricing information, sales strategies and business philosophy; 2) the covenant only

---

[6]The Court found that the two-year time restriction was unreasonable and
reduced it to one year.

19

prohibited the defendant from working for companies which produced substantially similar or competitive products; 3) defendant's inherent skill and experience were not stifled since he could continue to work as a salesperson as long as he did not work for a competitor; and 4) defendant's sole means of support was not destroyed since he could accept a sales job with any company not in competition with the plaintiff.

In this case, Defendant does not dispute the fact that he had access to confidential customer and company information.  He only claims that his interaction with customers was limited to complaints, repairs and infrequent sales calls, and that he has no current knowledge of customer repair problems, repair cycles and cost or timing concerns.  He does not dispute President Illencik's assertion that he was privy to: 1) costs and margins for Ajax products and services; 2) proprietary designs for crankshaft inductors manufactured by Ajax; 3) strategic plans for increasing Ajax's business in the heat treating area and in better competing with competitors such as Tech Induction; 4) key contacts for Ajax customers; and 5) tailored solutions developed by Ajax to address the concerns and issues of specific customers.

Also, as in *Proctor & Gamble* and *Avery Dennison*, the scope of the prohibition in the non-compete is limited--Defendant cannot work in the induction heat treating repair business in the automotive industry in Michigan, Indiana, Ohio and Windsor, Ontario. He can work in induction heat treating repair in those states in a non-automotive industry, or in the automotive industry in any other state besides Michigan, Indiana, Ohio and Windsor, Ontario.

Nevertheless, Defendant asserts that the scope of the agreement is not reasonable.  He argues that it is unreasonable to expect him to leave the state or find

20

work in another field because: 1) he is 48 years old; 2) he has almost 30 years of experience solely in his current line of work; and 3) "virtually all automotive sales for Ford and General Motors are dealt with and/or involve sales arising out of Michigan." Def. br. at pp. 9-10.

In support, Defendant cites *RAM Products Co., Inc. v Chauncey*, 967 F.Supp. 1071 (N.D. Ind. 1997), where a court found that a one-year non-compete agreement was unreasonable in scope. But, contrary to Defendant's assertion that *RAM* is analogous, the *RAM* defendant was distinguishable in several respects. The agreement prevented the defendant from working for any competitor in *any capacity*. Defendant was near retirement age (59) and had worked in the same industry for over 30 years. And, the *RAM* court found that it was questionable whether much of what plaintiff claimed was confidential or a trade secret was protected information.

The scope of the restriction in this case is not as broad as in *RAM*. The *RAM* defendant was precluded from working for a competitor in any capacity, but this Defendant may continue to work in this geographical area outside the automotive industry, or he can continue to work in the automotive industry in all but four states. Also, defendant is 11 years younger and he does not dispute his access to most of the confidential information listed by President Illencik or that much of it directly pertained to Ajax's strategic competitive plans.

For these reasons, the Court finds that Plaintiffs presented sufficient evidence that there is a likelihood of success on the merits of the breach of contract claim.

### ii.    Irreparable Harm

The loss of customer goodwill, fair competition or business advantage is

21

recognized as legitimate harm which is not readily quantified.  *Basicomputer,* 973 F.2d at 511-512; *Avery Dennison*, 118 F.Supp. at 854.  Defendant, however, contends that Plaintiffs cannot establish that they will suffer irreparable harm because he had limited interaction with customers, lacks knowledge of current customer repair problems, cycles or cost and timing concerns, Tech Induction allegedly already services Ajax's key customers, and Tech induction allegedly has already reverse engineered Ajax's crankshaft inductor.

There is no merit to Defendant's assertion.  Plaintiff's claim of irreparable injury is not negated even if Defendant's claims are true, because Defendant does not dispute his knowledge of other company and customer information listed by President Illencik which would directly impair Ajax's business advantage if revealed.  Therefore, this factor weighs in favor of Plaintiffs.

### iii.    Balance of Harms

As stated, Plaintiffs established a potential danger that confidential customer and company information will be disclosed to a direct competitor.  But, Defendant contends that he will be more severely harmed by an injunction because it is unreasonable to expect him to leave the state or seek employment outside his field in light of his age and the number of years he has pursued this line of work.  However, the *Avery Dennison* court rejected a similar argument, finding that the defendant took a calculated risk that he would suffer financial harm when he elected to violate the restrictive covenant:

> Any harm to [defendant] would be as a direct result of his own actions. [Defendant] was aware of the restrictive covenants, yet he chose to accept employment with Security Printing and to take the risk that the covenant with [Plaintiff] would not be enforced. [Defendant], a sophisticated businessman, made an economic

22

> decision to accept a job with greater salary, and understood that the
> result herein could be a possible consequence of his decision.

*Avery Dennison*, 118 F.Supp.2d at 855.

Likewise here, Defendant states in his affidavit that Illencik reminded him about

the non-compete agreement and threatened to sue him to enforce it if he took the job

with Tech Induction.  Def. Exh. A at ¶12.  However, Defendant ignored the threat

because Tech Induction offered him a greater opportunity for advancement and perhaps

to become an owner and shareholder.  *Id* at ¶9.  Furthermore, Defendant says he

believed that the clause was not enforceable, and he was aware of two other

employees against whom the clause was not enforced.  Pl. br. at p. 3.

These assertions indicate that, like the defendant in *Avery Dennison,* Defendant

took a calculated risk that his violation of the express provisions of the non-compete

agreement would either be unenforceable or that Illencik was making a hollow threat.

Therefore, as in *Avery Dennison*, the Court gives minimal weight to the challenges

Defendant claims he will face in securing new employment since it is a consequence of

the risk he took.  Moreover, any harm to Defendant is minimized by Plaintiffs' offer to

pay his salary and health care benefits while the injunction is in effect.

This factor weighs in favor of Plaintiffs.

### iv.    Public Interest

It is established under Ohio law that there is a public interest in "[p]reserving the

sanctity of contractual relations and preventing unfair competition."  *Blakeman*'s *Valley*

*Office Equipment v Bierdman*, 152 Ohio App. 3d 86, 93 (2003).

Based on all the foregoing, the Court finds that Plaintiffs met their burden for the

23

issuance of a preliminary injunction pending resolution of their breach of contract claim on the merits.

> **B.      Uniform Trade Secrets Act**

Plaintiffs assert that an injunction is also warranted for Defendant's violation of the Uniform Trade Secrets Act, Ohio R.C. §1333.61, *et seq.*  They contend that Ajax's confidential information and proprietary designs regarding the crankshaft inductor, strategic marketing plans, sales strategy, and pricing and margins are trade secrets of which Defendant had extensive knowledge.  Again, Defendant asserts that Tech Induction already services Ajax's key customers and has already reverse engineered the crankshaft inductor.  Further, he says that he has no knowledge of current customer repair problems, repair cycles and cost or timing concerns, and he denies taking any confidential lists, diagrams, plans drawings or other confidential information.

Neither party fully analyzes this claim under the four elements for issuance of a preliminary injunction.  But, there is sufficient evidence to support Plaintiffs' request.

Under Ohio law, actual or threatened trade secret misappropriation may be enjoined.  Ohio R.C. §1333.62.  A trade secret is defined as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the

24

circumstances to maintain its secrecy.

Ohio R.C. §1333.61(D).  The Court must consider several factors to determine whether

a trade secret exists:

> (1) the extent to which the information is known outside the business;
> (2) the extent to which it is known to those inside the business, *i.e.,*
> by the employees; (3) the precautions taken by the holder of the
> trade secret to guard the secrecy of the information; (4) the savings
> effected and the value to the holder in having the information
> withheld from competitors; (5) the amount of effort or money
> expended in obtaining and developing the information; and (6) the
> amount of time and expense it would take for others to acquire and
> duplicate the information.

*Proctor & Gamble*, 140 Ohio App.3d at 277 (footnote omitted).

The evidence presented establishes that there is a likelihood Plaintiffs will

succeed on their claim.  Pricing information, sales strategies and business philosophy

are regarded as trade secrets.  *Avery Dennison*, 118 F.Supp.2d at 854.  And,

notwithstanding certain information Defendant denies knowing or refutes as trade

secrets, President Illencik's averment that Defendant was privy to strategic marketing

plans, sales strategy and Ajax's pricing and margins is unrefuted.  Defendant also does

not dispute Illencik's assertion that significant steps were taken to keep this information

confidential and secret, including limiting access to senior management and instituting

password security measures.  Pls. br., Exh. A at ¶17.

The remaining factors also weigh in Plaintiffs' favor.  The threatened loss of

proprietary trade secret information constitutes irreparable injury.  *Avery Dennison*, 118

F.Supp.2d at 855.  The balance of harms analysis discussed with regard to the breach

of contract claim applies with equal force to this claim.  And, Ohio courts indicate that

the public interest is served by prohibiting the misappropriation of trade secrets.  *Id.*

25

For these reasons, Plaintiffs met their burden for the issuance of a preliminary

injunction pending resolution of their Uniform Trade Secrets Act claim on the merits.

## IV.    CONCLUSION

The Court **DENIES** Defendant's request for dismissal or summary judgment and

**GRANTS** Plaintiffs' request for a preliminary injunction enjoining Defendant.

**IT IS SO ORDERED.**


s/Victoria A.  Roberts
Victoria A.  Roberts
United States District Judge

Dated:  February 8, 2007

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 8, 2007.

s/Linda Vertriest
Deputy Clerk